## Jones v. Hicks.
### (Decided March 26, 1937.)

FLEM D. SAMPSON for appellant.
H. H. OWENS and J. B. CAMPBELL for appellee.

Opinion of the Court by Judge Thomas—Affirming.

The appellant, and defendant below, N. A. Jones, owned a farm in Knox county containing about 75 acres which was located some ten miles from Barbourville, the county seat. He acquired it some seven years prior to the accident involved in this litigation. At the time he obtained title to it there was then located upon it, on the side of a mountain, a small coal mine, designated in the record as a "wagon mine," the entrance into which was from the side of the mountain, and the mouth of it was something near 40 feet wide, and the opening extended straight back for some 175 feet.

On October 11, 1935, Everett Hicks, a youth nineteen years old, who lived with his mother in the neighborhood, was working in the mine when a large slate rock fell upon him and instantly killed him. This ordinary action was later filed in the Knox circuit court by his mother, who had been appointed and qualified as his administratrix, against appellant as owner and operator of the mine, to recover damages sustained by his estate for the destruction of his power to earn money. The answer was a denial of all the charges of negligence contained in the petition, as well as a denial that defendant was operating the mine at the time plaintiff's decedent was killed, since defendant alleged in his answer that at the time of the accident complained of in the petition, his mine was being operated by one Arnold Taylor under a lease between him and defendant, whereby the latter as lessor was to receive from Taylor, the lessee, a royalty of 25 cents per ton for all coal taken from the mine by the lessee, and that he (defendant or lessor) had nothing to do with the management or operation of the mine, nor with hiring any of the servants employed in it, and was, therefore, not liable for any negligence of his lessee, Taylor, whom he termed an "independent contractor." That defense was put in issue by a reply, and upon trial there was a verdict in favor of plaintiff for the sum of $4,000, upon which judgment was rendered in favor of plaintiff against defendant. The latter's motion for a new trial was overruled, followed by his prosecuting this appeal to this court.

Learned counsel for defendant devotes almost his

entire brief to a discussion of the question of the defense of independent contractor, referring only casually and very briefly to an item of claimed erroneous testimony introduced by plaintiff over defendant's objections. But the objections interposed were not ruled on by the court, and for that reason alone the error, if one, in the admission of the testimony may not be considered by us, since it is the duty of the objector to insist upon and procure a ruling of the court upon his objections, and if not done they will be waived. However, if that had been done in this case we do not regard the testimony as sufficiently material to constitute an error, since its admission had no possible bearing upon the only real material issue in the case, i. e., whether or not defendant was interested in the operation of the mine at the time of the death of young Hicks to any extent more than as lessor for a stipulated royalty. In other words, the issue made and tried was: Whether or not defendant was operating the mine itself with his alleged lessees as hired servants for that purpose, or whether he was a partner with them in the operation? That issue was submitted to the jury by an instruction, of which there was and is no complaint, and it found, either that defendant was the sole operator of the mine, or that he was a partner in its operation. We will now direct our attention to that issue and dispose of it in accordance with the evidence adduced at the trial.

At the outset it may be stated that the issue of negligence, as a result of which young Hicks lost his life, though denied in the pleading, was most abundantly proven—even to the extent of being silently admitted by defendant's counsel, since he does not attempt in his brief to combat that charge made in the petition. We will therefore devote neither time nor space in detailing the facts with reference to the dangerous condition of the mine, including its roof, nor to detailing the way and manner that the rock that killed Hicks was caused to fall, further than to say that there was imperfect propping, gross neglect in inspection of the roof and in not leaving necessary pillars to hold it in place. With that issue disposed of, there remains only the one with reference to the alleged independent contract with the supposed lessee or lessees on the terms hereinbefore stated.

The alleged lessee, as we have seen, was one Ar-

nold Taylor, who was a tenant on the tract of land owned by defendant and upon which he (defendant) also resided. Taylor had married a granddaughter, or a niece of defendant's wife, and it is vaguely intimated in the record that she had been reared in the Jones' household and sustained almost the relationship of child to Mr. and Mrs. Jones. He was a miner, thirty-three years of age, and he and defendant testified that some time in the latter part of June, 1935, he (Taylor), by a verbal lease for the term of one year, agreed to take over the mine and operate it and pay defendant, as royalty, 25 cents per ton for all coal taken from it. Some time in July following that alleged leasing contract, Taylor commenced taking coal from the mine, but according to his testimony he took in, as his joint partner in the lease, one Roy Sullivan, a nephew of Mrs. Jones, who was a cripple, having lost one leg, and according to that alleged arrangement Taylor and Sullivan were to operate the mine under the terms of Taylor's lease, but which Taylor, Sullivan, and Jones stated in their testimony was kept a secret from the latter. Sullivan had been and was then living with defendant as a member of his family for four years prior to that time, upon the terms that Jones was to furnish him with board and lodging for services and labor performed by Sullivan on defendant's farm. However, as we gather from the somewhat clouded condition of the testimony, Sullivan had the right to occasionally work out at other jobs in the neighborhood for the purpose of earning money with which to buy necessary clothing. Both Sullivan and defendant testified to that arrangement. After Taylor took charge of the mine, with Sullivan as his "taken in" partner, they with a hired hand proceeded to mine coal and put it in a bin located at the foot of the mountain by the aid of a timbered chute, starting from the mouth of the mine, and customers would load it in wagons from the bin and carry it to its destination.

According to the testimony, Taylor and Sullivan so operated the mine, in the alleged joint adventure, for some three weeks, when Taylor left it and turned it over exclusively to Sullivan. The latter employed one or two helpers at 75 cents per day and continued to mine coal in the same manner. Decedent was killed on a Friday, and on the prior Saturday he worked for the first time in the mine at the agreed price of 75

cents. The following Monday he worked on the farm of defendant after the latter had paid him for his day's wages for work in the mine on the previous Friday. There is also testimony that defendant requested him to go back to the mine and assist "the boys in taking out the coal," and he did return to the mine on Tuesday morning and worked every day until Friday, when he met his death at about 3 p. m. on that day.

There is evidence that another servant, who worked in the mine after Taylor left and before Hicks began working, was also paid for his services by defendant. However, the latter attempted to explain why such payments were made by him by saying that purchasers of coal had come to his house to pay Sullivan, who was the sole operator after Taylor quit, and he being absent from the Jones' residence, the bills were collected by Mrs. Jones, and it was with such proceeds that the payments of the servants were made. Taylor, who had abandoned the operation of the mine, as we have pointed out, returned on Tuesday before the fatal accident on the following Friday, and it is shown by him and Sullivan that he worked in the mines from that time on at the wage of 75 cents per day. Defendant hauled a considerable amount of coal for various purchasers in the neighborhood, but he claims that he was paid $1 per load (supposed to be a ton) for that hauling and which had nothing to do with the operation of the mine. However, it is undisputably shown that he was effecting sales of coal before the accident and while the mining operations were being prosecuted in the manner stated. He also hauled necessary supplies for the mining operation, including rails for the small coal car that the operators employed. No books appear to have been kept by any one, or if so they were not introduced. The entire manner of the conducting of the operations was not in accord with, nor even approached toward, the usual method employed where distinctive interests existed, i. e., that of lessor or lessee and which distinct interests were required to be protected. On the contrary, the alleged lessor and lessee each participated in transactions indicating joint operation. Moreover, neither Taylor nor Sullivan, the alleged independent contractors, possessed any property of any kind whatsoever, so far as the record discloses, and no provisions were made in the alleged verbal lease whereby defendant, as alleged lessor, would

be secured in his supposed royalty. Neither can the fact be overlooked that both of the alleged joint operators of the mine were not only related in the manner stated to the defendant, but both of them occupied his premises and one of them resided with him as a member of his family. Curiously enough also is the fact that the alleged lessee, Taylor, partially assigned his lease before beginning operations thereunder to Sullivan, who lived with defendant, and he (Taylor) later transferred all of his interest in the lease to the same party and abandoned the lease without defendant ever knowing anything about it.

In addition to all of the foregoing, it was proven at the trial that defendant warned those who worked in the mines, including Hicks, against possible accidents, and that he was at the bin, either hauling or superintending the hauling of coal three different times on the day of the accident. Nobody ever stated positively how much coal was mined, and of course it was not stated how much defendant earned as royalty under the supposed verbal lease, from the beginning of the operation up to the death of Hicks.

In the circumstances and under the facts outlined, it cannot be said that the verdict finding defendant interested in the operation of the mine, as an operator thereof, was without evidence to support it—much less could it be insisted that defendant's motion for a peremptory instruction should have prevailed. Such contentions are based solely upon the ipse dixit testimony of the parties to the alleged leasing contract, wholly disconnected from other parts of their testimony and from the other facts and circumstances to which we have referred negativing any such independent contract relationship. The jury having found—upon evidence sufficient to support it—that there was no independent contract whereby defendant could be legally relieved from liability, it becomes unnecessary to even refer to, much less discuss, the various opinions of this and other courts cited and relied on by counsel for defendant, in which the defense of independent contractor is available and others in which it is not available. If defendant was a partner in the operation of the coal mine on his farm with Taylor and Sullivan, or either of them—which the jury found was true—the argued defense of independent contractor is not available to him.

Likewise if he himself was operating the mine and paying Taylor and Sullivan and other necessary servants to labor in it, his liability for negligent operation would be undisputed. The jury under the instructions given by the court necessarily found that the operation of the mine was being conducted in one or the other methods, in either of which liability attached to defendant for any negligence in the operation whereby an employed laborer was injured or killed.

We therefore conclude that none of the grounds urged for reversal of the judgment is available for that purpose, and for which reason it is affirmed.